IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

YVONNE LAPPAT,                          )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )    Case No. 12-4249-CV-C-ODS
                                        )
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social Security, )
                                        )
            Defendant.                  )

## ORDER AND OPINION AFFIRMING
## COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying her applications for disability and Supplemental Security Income benefits. The Commissioner's decision is affirmed.

### I. BACKGROUND

Plaintiff was born in May 1966. Her education level is uncertain due to inconsistencies in the Record, but she earned a license as a Certified Nursing Assistant in January 2008 and has prior work experience as a cashier, nurse's aide, fast food worker, and assembly line worker. In these applications, she alleges she became disabled on September 5, 2006, due to a combination of sleep apnea, morbid obesity, degenerative joint disease, fibromyalgia, and pain associated with these conditions. Her claim was denied by an ALJ on May 12, 2009, but the Appeals Council remanded the matter. A second hearing was held before the same ALJ, who issued a second opinion on April 18, 2011. The language of second opinion indicates it is intended to focus on the issues specified in the Appeals Council's remand order, and for this reason it should be viewed as supplementing and not supplanting the May 2009 Order.

Plaintiff filed her claim on July 24, 2007.  The Disability Report Plaintiff submitted as part of her application states she based her claim on "heartache; high bp; nerve damage in arms and hands; sleep apnea" and sates she became unable to work on September 15, 2006.  However, Plaintiff also indicated that she worked after her onset date – in fact, that she was working at the time of her application – and that her disability did not cause her to work fewer hours, change duties or make any other changes.  R. at 394.  As noted, she obtained a CNA license in January 2008, and worked part-time at a convalescent home from July 2007 until February 2008.  R. at 348-09.[1]

In late September 2006 – shortly after being released from prison – Plaintiff went to Bothwell Regional Health Center with complaints of cramping and chest pain.  She was administered a stress test, which revealed a normal EKG, normal heart rate, and normal blood pressure.  R. at 664.  Another EKG (apparently, a resting EKG) was also normal.  R. at 652.  She was told to "[c]ontinue with nitro medication."  R. at 660.

In November 2006 Plaintiff began going to Katy Trail Community Health Center for regular medical treatment.  The records from Katy Trail are not always clear (and for some reason are not in any particular order), but it appears she was formally diagnosed as suffering from hypertension as early as April 2007.  However, the lengthy and numerous treatment records do not reflect any limitations imposed on Plaintiff due to hypertension.

In June 2007 Plaintiff applied for a job at Tyson's Foods.  She underwent a physical examination as part of the application process, during which it was noted that she had an abnormal nerve conduction study.  The results of that study are not in the Record.  Plaintiff was then sent to an occupational physician, who noted Plaintiff had no complaints associated with nerve problems and concluded Plaintiff suffered from "moderate sensorimotor median mononeuropathy" but was as able to perform duties so long as she avoided hard, prolonged or repetitive grasping or lifting greater than thirty pounds.  R. at 502.

---

[1]While the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date, the activities she engaged in – including part-time employment – are relevant in light of her claimed disabilities.

Later in June, Plaintiff underwent a sleep study and was assessed as suffering from obstructive sleep apnea. R. at 700-01. The diagnosis was confirmed in August. R. at 726-27. Plaintiff was directed to use a CPAP machine to help with her breathing/sleeping.

In mid-July 2007, Plaintiff went to the University of Missouri Health Care ("University of Missouri") complaining of chest pain. Examination revealed normal ventricular function, no coronary artery disease, and no apparent cause for chest pain. R. at 554. A chest x-ray, CT scan, and EKG were all normal. R. at 505, 507, 510. Ultimately, it was believed her chest pain was an allergic reaction to an antibiotic. R. at 504. No notable restrictions were imposed on discharge, although she was told to quit smoking. R. at 520-24. On discharge, she was prescribed nitroglycerin, Lipitor, lisinopril, and Norvasc, R. at 525 – apparently, these were the same medications prescribed by doctors at Katy Trail.

Plaintiff returned to the University of Missouri on August 1[2] for a follow-up after her July visit. The cardiologist concluded that Plaintiff's chest pain was not cardiac in nature, other than hypertension there were no diagnosable cardiac issues, and she was told to diet, exercise, and stop smoking. Her nitroglycerin was discontinued. R. at 533-34.

Eight days later, Plaintiff reported to Dr. David Autry at Katy Trail that she was having difficulty sleeping due to pain in her arms and legs. Plaintiff reported that the University of Missouri had released her to work but warned that she ran a risk of having another heart attack – even though the University of Missouri's records did not indicate she had a heart attack and actually advised her to exercise. Nonetheless, Dr. Autry restricted Plaintiff to light duty. His physical exam revealed nothing beyond her subjective complaint of chest pain, shortness of breath, and groin pain (which was related to the aftereffects of the catheter inserted during testing at the University of Missouri). R. at 598-99. Plaintiff returned to Dr. Autry in late September complaining of high blood pressure, numbness and tingling on the right side of her face, and chest

---

[2]Plaintiff indicates this visit occurred on August 16, Plaintiff's Brief at 7, but the records confirm the date of service was August 1 and that some of the additional doctor notes were added on August 16.

3

pains. R. at 738. Dr. Autry expressed plans to obtain tests to rule out peripheral artery disease and a CT scan of Plaintiff's head. Neither party points to (and the Court cannot locate) the results of any such tests. However, a test from the prior month (ordered by Dr. Autry) ruled out atherosclerotic disease. R. at 730. Plaintiff also underwent an EMG in late September. The test revealed "[e]arly peripheral sensorimotor neuropathy" and mild denervating changes at C6-7 and C7-8, but also noted Plaintiff put forth poor effort. R. at 733-34.

In January 2008 Plaintiff reported experiencing diminishing benefit from her CPAP machine. The machine was adjusted and she was again advised to stop smoking. Plaintiff also complained of neck pain. R. at 786-87. The following week, a CT scan revealed a polyp or cyst in her nasal cavity, and surgery was planned to correct her breathing difficulties. R. at 825, 873. The surgery was performed, and in February Plaintiff was reported to be healing well. R. at 838.

Meanwhile, Plaintiff sought assessment and treatment from the Orthopedic Clinic at the University of Missouri, where she complained of pain, weakness and numbness in her back and leg over the preceding year. She was diagnosed as suffering from degenerative disc disease at L5-S1, but due to her obesity and smoking history was not regarded as a good candidate for surgery. An epidural injection was considered, and Plaintiff was told "that she really has to start a cardiovascular exercise routine, stop smoking as well as lose weight." These steps were regarded as providing her "the best chance of getting off the medication she is on as well as improving her symptoms." R. at 828. Plaintiff was referred to another physician at the University of Missouri for further examination; this examination resulted in a similar diagnosis and treatment plan. Notably, the doctor indicated Plaintiff did not suffer from fibromyalgia. R. at 842. A steroid injection was administered in early March. R. at 843. Plaintiff returned in approximately six weeks and reported the injection did not provide relief. MRIs and x-rays revealed narrowing at L5-S1, and desiccation of the disc without narrowing at L4-L5. R. at 875, 956. Microdiskectomy was considered, and was ultimately preformed in May 2008. Two weeks after surgery she reported improvement in her symptoms. R. at 857-58. On June 16, Dr. Ivette Turner at Katy Trail wrote a note to support Plaintiff's request to be excused from performing community service in connection with her

4

probation. The note indicates Dr. Turner is writing the note on behalf of the doctor who regularly treats Plaintiff because that doctor was on vacation, and that Dr. Turner believes Plaintiff's medical condition precluded her from performing community service. The "medical condition" Dr. Turner refers to is not specified, but the remainder of the note strongly suggests she is referring to the fact that Plaintiff was recovering from recent back surgery. R. at 897.

In July 2008, Plaintiff underwent a stress test. The results were normal. R. at 941-42. On December 30 or 31, Plaintiff went to Bothwell Regional Health Center ("Bothwell") complaining of breathing difficulty, chest pain, and "a warm red spot on . . . the left calf." Testing confirmed Plaintiff had not suffered a heart attack, was not experiencing thrombosis, blood tests were normal – in fact, nothing out of the ordinary was discovered. Plaintiff was discharged on December 31 with instructions to diet and stop smoking. R. at 917-18. On January 20, Dr. Turner wrote a note stating only that Plaintiff should "no[t] work until medical issue resolved." R. at 900.

Meanwhile, Plaintiff saw Dr. Peripatna Ananth at Bothwell complaining of back pain running down her right leg. She was diagnosed as suffering from lumbago as well as disc displacement at L5-S1, and was administered a steroid injection. R. at 907. Plaintiff returned to Dr. Ananth in mid-March and received another injection. R. at 906.

In April, Plaintiff went to Pathways claiming her primary care provider made her seek treatment because she "blew up" because of the pain she was experiencing. R. at 1503. There is no corresponding report from any doctor confirming such a demand or referral. Contradictorily, Plaintiff later claimed she was seeking a psychiatric consultation in connection with a planned weight reduction surgery. R. at 1509.

In June 2009 (or perhaps earlier; the Record is not clear) Plaintiff began seeing Dr. William Dailey at Golden Valley Memorial Healthcare ("Golden Valley"). On June 11, Dr. Dailey diagnosed Plaintiff as suffering from peripheral neuropathy, depression, anxiety, hypertension, and fibromyalgia. R. at 970. There is no indication that Dr. Dailey performed any tests; while it may be that he relied on assessments from Plaintiff's prior doctors, none of those physicians diagnosed Plaintiff as suffering from fibromyalgia. One month later, an x-ray at Golden Valley revealed straightening of the cervical curve and spurs at C4-C5, C5-C6, and C6-C7. R. at 1593. In August, Plaintiff

5

told Dr. Dailey she was experiencing pain at a level 10 on a scale of one to ten, with the pain felt in her feet, legs, hands, and right side. Dr. Dailey diagnosed her as suffering from fibromyalgia and gout. R. at 1549-50. During subsequent visits in September and October, Plaintiff did not mention this pain. R. at 1544-48. In an undated note Dr. Dailey wrote that Plaintiff's care had been consolidated in his office and that Plaintiff "is barely able to ambulate . . . her gait is unstable . . . she is unable to sit for prolonged periods." No cause for these limitations is specified. No treatment is specified. No prospects are described, although Dr. Dailey indicates Plaintiff is "adherent to the prescribed treatment regimen" and that Plaintiff was "motivated and hopeful for a more motivated future." R. at 189. Interestingly, this note is virtually identical to one Dr. Turner wrote in May 2009, R. at 188 – and *that* note is interesting in that Dr. Turner claims to be Plaintiff's primary care physician even though one month later she wrote the previously-discussed note disclaiming such a relationship. See page 5, supra (citing R. at 897).

Plaintiff continued seeing Dr. Dailey at various times for various maladies. As relevant to Plaintiff's claims, in November 2009 he diagnosed Plaintiff as suffering from a "fibromyalgia flare" for which he prescribed Vicodin. R. at 1558. In February 2010 he diagnosed another fibromyalgia flare as well as radiculopathy at L5-S1, and he again prescribed Vicodin. R. at 1554. In March, Dr. Dailey wrote that Plaintiff had degenerative joint disease. R. at 1556. No diagnostic testing or further discussion is provided.

In April, Plaintiff went to the rheumatology clinic at the University of Missouri on Dr. Dailey's referral. She was seen by Nurse Deanna Davenport, who opined that Plaintiff's complaints of "all-over "flu-like aching" was consistent with fibromyalgia, and based on these complaints Plaintiff probably had fibromyalgia. R. at 980. X-rays of the cervical spine showed some "marginal spurring" but "pretty normal disk space distribution." R. at 979; see also R. at 992. Nurse Davenport recommended Plaintiff increase her vitamin D intake for fibromyalgia and trazadone to help her sleep. R. at 1665-68. On May 6, Nurse Davenport completed a Medical Source Statement – Physical ("MSS") indicating Plaintiff could lift less than ten pounds, stand or walk twenty minutes at a time and two hours per day, sit for twenty to thirty minutes per time and two

6

hours per day, and opined that any physical activity would increase Plaintiff's pain but Plaintiff's ability to engage in non-physical activity was further limited by her difficulties with fatigue and lack of concentration and memory secondary to pain. R. at 1672-73.

In the first hearing, which was held on April 2, 2009, Plaintiff testified that she weighed 300 pounds and was smoking three to five cigarettes per day. R. at 56, 60. She testified that she attempted to "move as much as possible" because if she did not she believed she would just spend her time lying down. R. at 61. She then explained that she could work for only twenty to twenty-five feet before her right leg stiffens, could stand for twenty to twenty-five minutes before experiencing "excruciating burning pain shooting from" her back to her foot, and could sit for forty-five minutes to an hour. R. at 61-62. She estimated she could not lift more than two pounds. R. at 62. Others in the house (primarily her son and his girlfriend) perform housework; although she tries to vacuum and dust, she can perform these tasks for no more than twenty minutes. R. at 63-64.

Two hearings were held after the Appeals Council remanded the matter. The first was held on June 21, 2010, but little testimony was taken. The primary matters discussed related clarifying certain facts and identifying materials that needed to be procured to supplement the Record. R. at 36-51. The second post-remand hearing was held on November 1, 2010. During this proceeding, confusion again arose over the state of the Record, as there appeared a possibility that Plaintiff had visited doctors on occasions for which records had not been supplied. R. at 15-19. After these matters were addressed, Plaintiff testified that in a typical day she wakes up between 7:30 and 8:00 and spends sixty to ninety minutes "to get my body to function and my mind to focus, my eyes to focus" and then takes her medication. She spends most of the rest of the day in her room. Her husband (who is already on disability) and her daughter in law do all the chores and most of the shopping. R. at 19-21. Plaintiff testified she tries to cook but can stand for only fifteen minutes at a time and needs to use a cane. R. at 20. She last gardened in 2007 or 2008. R. at 22. She stopped quilting four years prior due to pain in her hands. R. at 21. When asked what she does during the day, she listed "[s]itting, laying, griping, [being] irritable [and] depressed." R. at 22. Plaintiff estimated that she could not walk half a block or carry a twelve-ounce soda bottle. R. at 23-24.

7

She experiences constant pain in her back, neck, hands, legs, and feet that is, regardless of whether she is sitting or standing. R. at 23, 25.

The ALJ did not elicit testimony from a vocational expert ("VE") at the hearing because of the absence of records. Once the records were submitted, the VE obtained the VE's testimony in response to written questions. In the first hypothetical, the VE was asked to assume a person of Plaintiff's age education and experience who could lift or carry ten pounds, could stand or walk for two hours out of an eight hour day and sit for six hours out of an eight hour day. The hypothetical also assumed the person had moderate limitations on their ability to maintain concentration, persistence and pace, mild restrictions on the ability to maintain social functioning, could understand, remember and carry out at least simple instructions and tasks. The VE indicated such a person could not perform any of their past relevant work, but could perform work as an assembler, addresser, or thread separator. R. at 484-85. The second hypothetical differed from the first in that the VE was asked to assume the person could lift twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight hour day, and sit for two hours in an eight hour day. The VE indicated such a person could return to their past work as a production assembler, fast food worker, or convenience store clerk. R. at 486-87. Plaintiff submitted a written hypothetical in asking the VE to assume a person who was could sit for no more than thirty minutes, stand no more than fifteen minutes, lift no more than ten pounds, "is barely able to ambulate and her gait is unstable which would preclude walking" and had additional limitations regarding the use of her arms and hands. The VE indicated such a person could not perform any work in the national economy. R. at 494.

As noted on the first page of this Order, the ALJ's "complete" rationale requires combining both written rulings. In the first order, the ALJ found Plaintiff's subjective complaints were not credible because they were inconsistent with her medical records in that (1) her complaints to doctors did not mirror her testimony and (2) medical records did not support the degree of severity she described. Augmenting this credibility determination was Plaintiff's tendency to misstate the content of her medical records (for instance, by claiming she had a heart attack in July 2007 when the medical records demonstrated to the contrary). R. at 89-91. The ALJ discounted Dr. Turner's

8

conclusions (as represented in the two documents Dr. Turner authored at the time of the first order) because (1) they did not reflect any limitations on Plaintiff's ability to work and (2) did not set forth any medical basis for her conclusion. R. at 91. In the second order, the ALJ reiterated the continued inconsistencies between the degree of pain she reported, the clinical findings, and her testimony. The ALJ also noted Plaintiff's failure to lose weight or stop smoking as directed by all of her doctors. R. at 108-09. The ALJ also commented on the extent to which Plaintiff's medical ailments were alleviated with treatment and the fact that her known activities (primarily through 2008) were inconsistent with the limitations she described. The ALJ also considered Plaintiff's prior felony convictions (one drug-related, the other relating to either a probation violation or a bad-check charge (or both)) a negative factor in her credibility. R. at 110-11. The ALJ also noted the absence of a basis for a diagnosis from Nurse Davenport and Dr. Dailey. R. at 111-12. The ALJ found Plaintiff retained a residual functional capacity consistent with the first hypothetical, and thus concluded Plaintiff could not perform her past work but could perform other work in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

9

A.  Treating Physicians

Plaintiff first contends the ALJ erred in failing to defer the opinions offered by several of her treating physicians.   Generally speaking, a treating physician's opinion is entitled to deference.  This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record.  E.g., E.g., Anderson v. Astrue, 696 F.3d 790, 793-094 (8th Cir. 2012); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010). "The treating physician rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians."  Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991) (citation omitted).

Here, the Record supports the ALJ's decision.  Dr. Turner's initial note indicates specifically disclaims a treating relationship.  None of her three notes provide any basis for the conclusions they offer, and Plaintiff has not identified any supporting examinations performed by Dr. Turner that either (1) demonstrate she actually treated Plaintiff or (2) support Dr. Turner's conclusory statements.  It should also be noted that Dr. Turner's conclusion that Plaintiff could not work is not a medical opinion and is not entitled to deference.  E.g., Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995) ("opinions as to whether the claimant could work or be gainfully employed [are] outside the medical province . . . .").  Nurse Davenport is a nurse and not physician, so regulations do not accord her diagnosis any special deference.  20 C.F.R. §§ 404.1513, 416.913.  It should also be noted that Nurse Davenport did not reach her diagnosis of fibromyalgia after performing the test normally utilized for that condition.  See Chronister v. Baptist Health, 442 F.3d 648, 655 (8th Cir. 2006) (describing test); Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003) (same).  Similarly, Dr. Dailey did not perform the test (or, as far as the Court can ascertain, any tests) in arriving at his conclusions, and his assessment that Plaintiff cannot work is a vocational opinion to which no deference is due.

Plaintiff also faults the ALJ for failing to points to records supplied by Dr. Mary Beegle.  To be fair, Plaintiff did not submit Dr. Beegle's records until after the ALJ wrote the second opinion.   Dr. Beegle's records were submitted to the Appeals Council for its

subsequent review, but it is not fair to fault the ALJ for failing to address them. However, given that the Appeals Council considered Dr. Beegle's records, R. at 1-4, those records become part of the administrative record and the Court must ascertain whether the ALJ's decision is supported by the Record as a whole including this new material. E.g., O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003). Dr. Beegle submitted two items. The first is a one-paragraph statement dated May 24, 2011, that is very similar to the one-paragraph notes written by Dr. Turner and Dr. Dailey. See page 6, supra. It indicates Dr. Beegle had been treating Plaintiff since December 2010 and provides little insight into Plaintiff's condition before that date other than to say Plaintiff had "severe depression and anxiety" so it provides little basis for concluding when this condition developed. The note also states Plaintiff cannot presently work, but indicates she could at some time in the future. R. at 1674. Dr. Beegle also provided a two-page Medical Source Statement – Mental that indicates Plaintiff is markedly limited in a variety of respects – but contains no diagnosis. No treatment notes are provided at all. This makes it impossible to conclude that Dr. Beegle's opinions have a sufficient basis to justify deferring to her opinions.

### B. Plaintiff's Credibility

Plaintiff also contends the ALJ erred in discounting her credibility, arguing the ALJ (1) put too much weight on the fact that she was previously convicted of crimes, (2) should not have faulted her for failing to lose weight or stop smoking, and (3) ignoring the fact that Plaintiff has diagnosable back ailments. The Court disagrees.

It must be remembered that the ALJ is the finder of fact, and the Court is not permitted to conduct a de novo review of the ALJ's factual findings. This includes findings regarding credibility. E.g. Buckner v. Astrue, 646 F.3d 546, 556 (8th Cir. 2011). Here, The critical issue is not whether Plaintiff experiences pain, but rather the degree of pain that she experiences. House v. Shalala, 34 F.3d 691, 694 (8th Cir.1994). As there is no medical test for determining the existence or extent of pain – or a person's tolerance for it – determinations regarding the effects of pain are largely factual in nature. The familiar standard for analyzing a claimant's subjective complaints of pain is

11

set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. The claimant's daily activities;
> 2. the duration, frequency and intensity of the pain
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

The failure to follow a physician's advice is inconsistent with complaints of disabling pain. E.g., Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006). Doctors repeatedly told Plaintiff that her obesity was a significant contributor to her pain. She was also told to stop smoking. She did not do so. Plaintiff posits the possibility that she was unable to lose weight or stop smoking, but there is nothing in the Record documenting her failed efforts to comply (by, for instance, accepting one of her doctors' many offers to provide smoking cessation assistance).

Plaintiff's contention that the ALJ should not have relied on her criminal history is not well-taken. Juries – who are also charged with finding facts – are routinely told they may consider a person's prior felony convictions in determining credibility. An ALJ is not prohibited from doing so. The Court also notes that Plaintiff's criminal history was one of many factors considered by the ALJ.

Here, the Record demonstrates Plaintiff's complaints to doctors were rather minimal at and shortly after her alleged onset date. While her complaints increased, they never reached the severity described in her testimony. The ALJ was entitled to consider the nature of the treatment she received, her complaints to doctors, the conservative treatment prescribed, Plaintiff's failure to follow her doctors' advice, inconsistencies between her activities and her claimed limitations (particularly through 2008), her doctors' assessments (or more precisely, her doctors' failure to suggest that she was as limited as she described), and the results of medical tests in order to evaluate Plaintiff's credibility. The Court is convinced the ALJ's factual determination is supported by substantial evidence in the Record as a whole.

### C. Residual Functional Capacity

Plaintiff contests the ALJ's determination of her residual functional capacity ("RFC"). To the extent Plaintiff's arguments rest on the ALJ's credibility determination, those arguments have been addressed. Plaintiff also contends the ALJ discounted the effects of fibromyalgia. Plaintiff's argument intimates that a diagnosis of fibromyalgia means one is automatically disabled, which is not true. Moreover, while the ALJ (as has the Court) expressed misgivings as to whether Plaintiff was actually diagnosed with fibromyalgia, it is not the diagnosis that becomes part of the RFC. The RFC describes a Plaintiff's capabilities and limitations as a result of medical conditions, but it is not a list of medical conditions. And the Court holds the RFC was supported by substantial evidence in the Record as a whole.

## III. CONCLUSION

For these reasons, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                                          /s/ Ortrie D. Smith
                                                         ORTRIE D. SMITH, SENIOR JUDGE
DATE: July 28, 2013                        UNITED STATES DISTRICT COURT